

Nicole H. Waid, Esq.
Partner

2390 Tamiami Trail North
Suite 100
Naples, Florida 34103

Direct: (202) 906-9572

nicole.waid@fisherbroyles.com
www.FisherBroyles.com

**CONFIDENTIAL: EXEMPT FROM FOIA**

**VIA EMAIL AND FEDERAL EXPRESS**
Heather H. Hunt
Clifford Rones
Chief, FARA Registration Unit
U.S. Department of Justice
National Security Division
600 E Street, N.W.
BICN - Room 1300
Washington, DC 20004

July 27, 2018

        Re:    <u>RM Broadcasting, LLC</u>

Dear Ms. Hunt and Mr. Rones:

We are in receipt of your letter dated June 21, 2018, requiring RM Broadcasting, Inc. to register pursuant to the Foreign Agents Registration Act of 1938, as amended, 22 U.S.C. 611 *et seq.* ("FARA"). We respectfully disagree with your analysis and final determination that our client must register pursuant to FARA. We believe the following additional facts and legal analysis below support our conclusion that RM is not an agent of a foreign principal and does not have an obligation to register. We respectfully request reconsideration of the government's conclusion.

## FACTS

Arnold Ferolito is the sole owner of RM Broadcasting, LLC. Mr. Ferolito is an American citizen who was born and raised in Bronx, New York. Mr. Ferolito graduated from Bronx Community College with an Associate Degree in Applied Science and went to work for the American Broadcasting Company in 1962. In 1968, he founded A.F. Associates Inc., an engineering firm dedicated to the design and fabrication of high-end video and television facilities. Mr. Ferolito was also a founder and Executive Vice President of Video Services Corporation, the parent company of several video/television enterprises, including Atlantic Satellites Communication Inc., a state-of-the-art facility transmitting television programs globally, and Waterfront Communication Corp., a provider of fiber optic communication links in the New York area and around the world. Video Services Corporation was sold to Liberty Media Corporation in December 2000.

From 2001 to 2008, Mr. Ferolito served as Executive Vice President of Building Performance Equipment, Inc., a company that manufactured heating units capable of working with existing systems or as stand-alone units to ventilate most areas of a typical commercial building.

Mr. Ferolito attempted retirement after leaving Building Performance Equipment, Inc., but he missed the excitement and challenge of the business world. In 2010, Mr. Ferolito established RM Broadcasting, LLC under the laws of the State of Delaware, a company created to lease broadcast properties and build off Mr. Ferolito's vast prior experience and success in the broadcasting industry. RM contracts with third party program providers and Federal Communications Commission ("FCC") licensees for the transmission of programming over airtime on licensed radio broadcast stations. RM merely purchases airtime from FCC licensees and resells that airtime to radio programmers pursuant to commercial service agreements; RM does not participate in the content of any broadcasts and does not own the broadcasting facility.

RM sold airtime to a Washington DC radio station, WZHF 1390 AM, and a New York radio station, WNSW 1430 AM, from 2010 until 2013. When the contract expired, RM sought additional business opportunities. In July 2016, RM, through Mr. Ferolito as President, contacted Sputnik International via letter with an offer to sell broadcast time for broad signal distribution; RM did not receive a response to this commercial business offer. RM sent another letter to Sputnik International in September 2016 with amendments to pricing; RM did not receive a response to this commercial business offer. RM sent a third offer letter to Sputnik International in October 2016; RM did not receive a response to this commercial business offer. RM persisted and contacted Sputnik International a fourth time in November 2016 with another commercial business offer to lease broadcast properties. *Rossiya Segodnya* responded to the business offer, letting RM know that *Rossiya Segodnya* was examining the Company's proposal alongside those of other competitors.

An entire year lapsed and RM did not hear back from *Rossiya Segodnya* regarding its business offer. RM reached out to *Rossiya Segodnya* again in August 2017 and November 2017. Finally, in November 2017, *Rossiya Segodnya* acknowledged that RM had beat out its competitors and *Rossiya Segodnya* agreed to the terms of RM's commercial business offer. RM Broadcasting and *Rossiya Segodnya* entered into a Services Agreement in November 2017, over one (1) year after RM's original business proposition. All of the stated correspondence is attached as ***Exhibit A.***

Mr. Ferolito, age 75, is now semi-retired and spends the majority of his time in Palm Beach County, Florida. He continues to serve as the President/CEO of RM and is currently pursuing the lease of broadcast properties to a number of interested companies both inside and outside of the United States.

It is clear that these facts do not substantiate the government's theory that RM acts as an agent, representative, employee, or servant or a foreign principal. Furthermore, these facts prove that neither RM nor Mr. Ferolito work at the order, request, or under the direction or control, of a foreign principal and none of RM's are directly or indirectly supervised, directed, controlled, financed, or subsidized in whole or in major part by a foreign principal. Mr. Ferolito is, and has always been, a successful

businessman. The Service Agreement with *Rossiya Segodnya* is strictly a commercial business arrangement entered into for the purpose of making a monetary profit. This is corroborated by the attached communications in *Exhibit A* whereby RM was soliciting business from Sputnik International for over one year prior to beating out several competitors and obtaining the business. Besides this commercial business arrangement, Mr. Ferolito has no affiliation with the Russian government. His wife, Olga, is an United States citizen and Russian immigrant and Mr. Ferolito travels to Russia to visit his wife's family and for business purposes, but he does not participate in any activity that promotes Russian interests or values. We believe that if presented with the above-referenced facts, a judge and/or jury will agree that RM is not an agent of *Rossiya Segodnya*.

## LEGAL ANALYSIS

A. Agency Relationship

According to 22 USC § 611(c), the term **"agent of a foreign principal"** means (1) any person who acts as an agent, representative, employee, or servant, **or** any person who acts in any other capacity at the order, request, or under the direction or control, of a foreign principal **or** of a person any of whose activities are directly or indirectly supervised, directed, controlled, financed, or subsidized in whole or in major part by a foreign principal, **and** who directly **or** through any other person--

> (i) engages within the United States in political activities for or in the interests of such foreign principal;
>
> (ii) acts within the United States as a public relations counsel, publicity agent, information-service employee or political consultant for or in the interests of such foreign principal;
>
> (iii) within the United States solicits, collects, disburses, or dispenses contributions, loans, money, or other things of value for or in the interest of such foreign principal; or
>
> (iv) within the United States represents the interests of such foreign principal before any agency or official of the Government of the United States.

The FARA Unit states that RM must register because it serves as a "publicity agent" and "information services employee" for *Rossiya Segodnya*, however the government fails to address the section of the statute that requires an agency relationship and requires activities under the direction and control of a foreign principal. Without this further analytical step, the government's rationale fails.

Expanding the definition of "agent" to the contractual relationship between RM and *Rossiya Segodnya* goes well beyond the legislative intent of the statute. In amending the definition of agent in 1966 Congress emphasized that the Act should not require the registration "of persons who are not, in fact, agents of foreign principals but whose acts may incidentally be of benefit to foreign interests, even though such acts are part of the normal course of those persons' own rights of free speech, petition or assembly." H.R.Rep. No. 1470, 89th Cong.2d Sess. 5-6 (1966), *reprinted in* 1966 U.S. Code Cong. & Ad. News. 2397, 2401. *See also Attorney General of the United States v. Irish People, Inc.,* 796 F.2d 520 (DC Cir. 1986). The 2016 Office of Inspector General Report reiterated this legislative intent stating, "While foreign governments may be creative in their attempt to influence U.S. policy and sway public opinion, if it is done in a way that **does not create a statutory agency relationship** on the part of the agent acting within

the United States at the direction or control of the foreign government, then **there is no agent of a foreign principal with an obligation under FARA**." [emphasis added] Office of Inspector General Report, *Audit of the National Security Division's Enforcement and Administration of the Foreign Agents Registration Act* (2016), page 9.

The service agreement between RM and *Rossiya Segodnya* may incidentally be of benefit to foreign interests, but it most certainly does not create an agency relationship and, pursuant to the OIG Report, it does not create an obligation to register.  In fact, in contradiction to the government's conclusion, the Services Agreement clearly states that the contractual relationship does **not** create a partnership or agency relationship between the parties: "***Section 18: No Partnership or Agency***: Nothing in this Agreement is intended to or shall operate to create a partnership between the Parties or to authorize either party to act as an agent for the other.  Furthermore, neither Party shall have authority to act for or on behalf of or otherwise to bind the other in anyway (including, but not limited to, the making of any representation or warranty, the assumption of any obligation or liability and the exercise of any right or power)."  Moreover, there is not a scintilla of evidence to support a government theory that RM is subject to the direction or control of a foreign government.  RM entered into a commercial transaction with *Rossiya Segodnya* which could be terminated at any time due to breach of the Service Agreement: "***Section 10: Termination:*** Should any Party hereto consider further performance of this Agreement unreasonable *for itself*, that Party may notify the other Party of the termination of this Agreement in writing not later than 90 (ninety) calendar days…". [emphasis added].  This is a typical commercial transaction whereby both parties came to a meeting of the minds for the offer and acceptance of services for valuable consideration.

The facts surrounding the inception of the contractual relationship also contradict the government's analysis.  According to the attached documentation in ***Exhibit A***, Mr. Ferolito sought business opportunities for the sale of broadcast time to *Rossiya Segodnya* numerous times and was completely ignored for several months. Mr. Kochetkov's eventual reply states that *Rossiya Segodnya* is considering RM's proposal amongst other competitors.  It took an additional year for RM to be awarded the contract from *Rossiya Segodnya*. Mr. Ferolito sought this commercial business opportunity strictly to make a profit, as is the objective of every commercial business transaction.

DOJ regulations have not provided further clarification on the legislative intent of the statute and the scope of the agency requirement under FARA, thus leaving the courts to interpret the requirements of an agency relationship.  The Third Circuit applied a common law standard to define the agency relationship stating:

> "The true test, we think, was whether agency in fact existed, with the term agency defined substantially as in the Restatement of Agency, Section 1, which states it to be: 'The relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act'."  *German-American Vocational League, Inc.*, 153 F.2d at 864 (3rd Cir. 1946).

4

In 1981, the District Court for the Southern District of New York rejected the classic Restatement definition of agency, without mentioning the Third Circuit opinion, and held that "it is not necessary for plaintiff to prove that defendant is an "agent," in the Restatement sense, or a "person who acts in any other capacity ... under the direction or control" of the IRA; it is sufficient to establish agency under the Act that defendant is a "representative" of the IRA, or acts at its "request."" *Attorney General of United States v. Irish Northern Aid Committee,* 530 F. Supp. 241, 257 (SDNY 1981). The Second Circuit affirmed the rejection of the common law standard, but attempted to clarify the circular reasoning of the lower court with the following cautionary language:

> "Nevertheless, the Act requires registration by a person who acts, in specified ways, at a foreign principal's "request," we caution that this word is not to be understood in its most precatory sense. Such an interpretation would sweep within the statute's scope many forms of conduct that Congress did not intend to regulate. The exact perimeters of a "request" under the Act are difficult to locate, falling somewhere between a command and a plea." *Attorney Gen. of United States v. Irish N. Aid Comm*., 668 F.2d 159, 161 (2d Cir. 1982).

It is important to note that even this lower standard utilized to establish agency under the Act needs to be supported by evidence. The lower court found that evidence in the form of numerous letters was sufficient to prove the nature of the relationship and "support the uncontroverted assertion that defendant is a representative of, or acts at the request, of the IRA." *Attorney General of United States v. Irish Northern Aid Committee,* 530 F. Supp. 241, 258-259 (SDNY 1981). No such evidence exists in the instant matter.

The facts presented by the business relationship between RM and *Rossiya Segodnya* do not fall within the agency definition pursuant to the analysis of either the Third Circuit or the Second Circuit. Pursuant to the Restatement of Agency theory, there is no evidence that RM acted on behalf of or was subject to the control of a foreign principal. The Services Agreement was a commercial business transaction entered into by two independent parties for commercial profit and could be terminated by either party at any time for breach of contract. The government has not identified any evidence to prove that RM was directed or controlled by *Rossiya Segodnya* because no such evidence exists.

Neither was RM acting at the request of or as a representative of *Rossiya Segodnya* pursuant to the Second Circuit's theory. RM sought *Rossiya Segodnya's* business for the purpose of commercial profit. The Company did not respond to a "request" from *Rossiya Segodnya* anymore than any customer seeks an internet connection with their internet carrier or a telephone connection with their phone service provider. The government's new interpretation of FARA would have far-reaching and damaging ramifications for other news and media sources, such as social media sites, internet providers, multichannel video programmer distributors such as Comcast, Time Warner/Charter Communications and FiOS, as well as larger broadcasters.

We reviewed other relevant caselaw to determine the factors a court may consider sufficient to prove an agency relationship. From our review, it is apparent that the government does not possess sufficient facts to prove an agency relationship in the instant case. In *Attorney General of the United States v. Irish People, Inc.,* the Court of Appeals found that there needs to be sufficient evidence of formal control over a party and reversed and remanded for trial on the issue of whether Irish People is an agent of a foreign

principal under FARA. Specifically, the Court stated, "The undisputed facts offered to establish that the newspaper acted at INAC's order or request were entirely circumstantial. No request, order, command, or directive was ever shown. There was no indication that Irish People had printed any articles at INAC's request or sought INAC's approval of its editorial views. Nor was there any proof that Irish People had ever taken any action because it had been urged, prodded or instructed to do so by INAC." *Attorney General of the United States v. Irish People, Inc.*, 796 F. 2d 520 (DC Cir. 1986).

It is also important to note that the lower court stated that a mere exchange of money for commercial purposes would not be sufficient evidence to establish an agency relationship. Specifically, the Court wrote:

> "Defendant has two responses to plaintiff's argument that it received substantial subsidies from INAC. Initially, it argues that the money received from INAC was approximately equal to the value of the advertisements provided by defendant to INAC. Defendant also argues that Woodward & Lothrop might be a substantial advertiser in the *Washington Post,* but that does not mean that the Post is an agent of Woodward & Lothrop's. **Defendant's logic is impeccable, as far as it goes**. If, in addition to being a substantial advertiser in the *Post,* however, Woodward & Lothrop had the same Board of Directors as the *Post,* and provided the *Post* with offices and telephone facilities free of charge, then the *Post* might well be found to be the agent of Woodward & Lothrop. *Attorney General of the United States vs. Irish People, Inc.* 595 F. Supp 114 (1984). [emphasis added]

The government is relying on a commercial Service Agreement for services performed in exchange for monetary compensation as the basis for the agency relationship. These facts alone are insufficient to establish an agency relationship pursuant to FARA. *Michele Amoruso E. Figli v. Fisheries Development Corporation* appears to corroborate the notion that a mere exchange of money does not establish an agency relationship. In that case, the Court held that a corporation which receives financial support from a foreign principal without being subject to its control and whose lobbying efforts benefit a foreign government but are not subject to the foreign government's control is not an agent under FARA. *Michele Amoruso E. Figli v. Fisheries Development Corporation* 499 F.Supp. 1074, 1081-82 (S.D.N.Y.1980).

The FARA Unit states that RM must register because it serves as a "publicity agent" and "information services employee" for *Rossiya Segodnya*, however Subsections 611(c)(i)-(iv) are not applicable if the government cannot prove the threshold agency relationship. Based upon the facts presented and our subsequent legal analysis, we respectfully disagree with the government's assertion that our client is required to register pursuant to FARA. If the government has additional facts to prove an agency relationship, we respectfully request that those facts be shared with us so we can properly advise our client.

B. Activities Supervised, Directed, Controlled, Financed, or Subsidized

The government can also prove that a person is an agent of a foreign principal if a person's activities are directly or indirectly supervised, directed, controlled, financed, or subsidized by a foreign principal. 22 USC § 611(c). We adopt the commonly understood Webster's dictionary meaning of these terms pursuant

to guidance set forth in *Michele Amoruso E. Figli v. Fisheries Development Corporation* 499 F.Supp. 1074, 1082 (S.D.N.Y.1980):

- Supervised: "To be in charge of." RM entered into a commercial transaction for the resale of radio airtime. Pursuant to the contract, either Party can terminate the contract for breach if the services are not provided. The contract does not have any terms of supervision and neither RM nor Mr. Ferolito report to *Rossiya Segodnya*. There is no evidence to support the proposition that *Rossiya Segodnya* is "in charge of" RM.
- Directed: "Subject to supervision or regulation." As stated above, RM is not supervised by *Rossiya Segodnya*. The only government regulating RM's activities is the United States government.
- Controlled: **"**Restrained." *Rossiya Segodnya* does not have the authority to restrain any activities or decisions of RM or Mr. Ferolito. Mr. Ferolito, an American citizen, is the sole owner and CEO of RM. In a footnote in the letter to our client dated June 21, 2018, DOJ states "We note that under FARA's implementing regulations, "[a]s used in the Act, the term *control* or any of its variants shall be deemed to include the possession or exercise of the power, directly or indirectly, to determine the policies or the activities of a person, whether through the ownership of voting rights, **by contract,** or otherwise." (Emphasis added.) 28 C.F.R. § 5.100(b). We understand the emphasis on the word "contract," however DOJ fails to provide any proof of the first part of the regulation, "the possession or exercise of the power." In this case, *Rossiya Segodnya* does not have any power over RM or Mr. Ferolito.
- Financed: "Money or other liquid resources of a government, business, group, or individual." RM receives compensation for services provided pursuant to the Services Agreement. The Company does not receive any additional money or financing from *Rossiya Segodnya*.
- Subsidized: "To purchase the assistance of by payment of a subsidy." RM does not receive any financial aid, support, backing, or assistance from *Rossiya Segodnya*. The two companies are wholly independent of each other.

Based upon the common definitions of the words in the statute, RM does not fall within the statutory definition of an agent of a foreign principal and, as such, Subsections 611(c)(i)-(iv) are not applicable.

C.   Exemptions

It is clear from the above facts and analysis that RM is not the agent of a foreign principal. However, assuming, *arguendo*, RM's Services Agreement with *Rossiya Segodnya* creates an agency relationship, there is a strong argument to be made that RM is not an "agent of a foreign principal" pursuant to 22 USC § 611(d) which states that an "agent of a foreign principal" does *not include* "any news or press service or association organized under the laws of the United States or of any State or other place subject to the jurisdiction of the United States…so long as it is at least 80 per centum beneficially owned by, and its officers and directors, if any, are citizens of the United States, and such news or press service or association, newspaper, magazine, periodical, or other publication, is not owned, directed, supervised, controlled, subsidized, or financed, and none of its policies are determined by any foreign principal…" RM is a Delaware limited liability company, formed in January 2010, that contracts with third parties and

Federal Communications Commission ("FCC") licensees for the transmission of programming over airtime between the programmers and the licensed radio broadcast stations. Its 100% member is Arnold Ferolito, a United States citizen. Mr. Ferolito is the sole member, officer and operator of RM. RM has no employees. RM is not owned, directed, supervised, controlled, subsidized or financed by a foreign principal, and none of its policies are determined by any foreign individual or entity. Although the statute does not specifically mention radio broadcasts or activities related to radio broadcasting, more recent interpretations of the First Amendment would indicate that these newer forms of media would fall within the spirit of this exclusionary provision.

There is also an argument that RM is exempted from registration pursuant to 22 USC § 613(d) which exempts "Any person engaging or agreeing to engage only (1) in private and nonpolitical activities in furtherance of the bona fide trade or commerce of such foreign principal…". We look to 28 CFR §5.304(a) to clarify the terms trade or commerce, "As used in section 3(d), the term trade or commerce shall include the exchange, transfer, purchase, or sale of commodities, *services*, or property of any kind." 28 CFR §5.304(b) states, "For the purpose of section 3(d) of the Act, activities of an agent of a foreign principal as defined in section 1(c) of the Act, in furtherance of the bona fide trade or commerce of such foreign principal, shall be considered "private," even though the foreign principal is owned or controlled by a foreign government, so long as the activities do not directly promote the public or political interests of the foreign government." RM purchases airtime from FCC licensees and resells that airtime to radio programmers pursuant to commercial service agreements. RM is engaged in a Service Agreement with *Rossiya Segodnya* strictly for the sale of radio airtime; this is a typical commercial sales transaction and one that is contemplated by the exemption in § 613(d).

Furthermore, by focusing on the content of the radio broadcasts, it appears that the government is pushing constitutional boundaries and headed down a very slippery slope. Radio Sputnik is a news agency that reports news stories via radio broadcasts. RM is not involved in any political activities and the government has not presented any evidence, besides a typical commercial service agreement, to suggest that RM is an agent of *Rossiya Segodnya*. The government may not like some of the content within Radio Sputnik's broadcasts, however it is not the government's role to restrict access to the American people of unpopular ideas or negative news stories. The American citizen can choose to listen to the broadcast or simply change the channel. If the government requires people who are not agents of a foreign principal and who have never been, and never will be, under the direction and control of a foreign principal to register pursuant to FARA, it will have a chilling effect on commerce and will directly interfere with contractual business relationships. Requiring American businesses to disclose trade secrets, including confidential financial fees pursuant to service agreements, is not in the best interests of American businesses and it does nothing to protect the American people. The requirement of registration pursuant to FARA is, quite simply, government overreach.

**CONCLUSION**

We have reviewed the Service Agreement and the attached correspondence in *Exhibit A*. We do not see any evidence that RM was an agent of a foreign principal or that RM acted under the direction or control of a foreign principal. As such, we respectfully disagree with the FARA Unit's conclusion and would ask

for reconsideration of the registration requirement.  If the FARA Unit has any additional evidence of an agency relationship, we ask for the opportunity to view such evidence prior to making our final decision.

Thank you for taking the time to review this additional material.  Please do not hesitate to call me with any questions.

Best regards,

Nicole H. Waid, Esq., Partner